G. F. KNORR, Appellant, v. WILLIAM S. BEARDSLEY, Governor of Iowa, et al., Appellees.

No. 47486.

(Reported in 38 N. W. 2d 236)

June 14, 1949.

Harold Newcomb, of Des Moines, for appellant.

Robert L. Larson, Attorney General, and Clarence A. Kading and Kent Emery, Assistant Attorneys General, for appellees.

BLISS, J.—The title of chapter 59 of the Laws of the Fifty-second General Assembly is:

"AN ACT authorizing the state of Iowa to become indebted in the amount of eighty-five million dollars ($85,000,000) and providing for the issue and sale of bonds of said state in evidence thereof, to procure funds for and pay service compensation to persons who served in the armed forces of the United States at any time between the sixteenth day of September, 1940, and the second day of September, 1945, both inclusive or their successors in interest, providing for a board to administer such payments, providing for additional compensation to persons under disability, providing for the imposition, levy and collection of a direct annual tax sufficient to pay the principal and interest on said bonds, and providing penalties for the violation of the provisions of this act; providing for the application of any surplus to the retirement of the indebtedness herein created; and providing for submission of this act to the people to be voted upon at the general election to be held in the year 1948."

The Act was approved May 19, 1947. As provided by the act it took effect immediately upon its adoption and approval at the general election on November 2, 1948, in which 743,447 votes were cast for, and 210,465 votes were cast against, the measure.

We note briefly the sections of the Act pertinent to this appeal:

1.   The state "is hereby authorized to become indebted" in the amount of $85,000,000, evidenced by the issuance and sale of negotiable coupon bonds of the state, the proceeds of which shall be paid into the treasury of the state to be expended for payment of service compensation of persons defined in section 4, or for the benefit of persons prescribed in section 10, and for expenses incurred in carrying out the provisions of the act;

2.   the state treasurer is directed to prepare bonds of the kind and in the total amount noted, bearing interest at a rate not to exceed $2\frac{1}{2}\%$ a year, payable semi-yearly, and issued so that the indebtedness shall be payable in 20 equal yearly installments, the last of which shall be within 20 years from the date of issue; the treasurer shall sell the bonds to carry out the provisions of the act;

3.   the proceeds of the bonds paid into the state treasury shall constitute a service compensation fund for distribution to the beneficiaries, and said $85,000,000 is hereby appropriated therefrom for the purpose of this act;

4, 5.   define the beneficiaries and the amounts of service compensation to be paid to each of them;

6, 7, 8, 9.   create the compensation board and prescribe duties, the filing of applications, and the penalties for false statements;

10.   provides that after the payment of all claims, and administrative expenses of the board, "all funds up to and including $3,000,000 remaining in the hands of * * * service compensation board shall constitute an additional compensation fund to be administered by the said board for the amelioration of the condition of residents of this state within the classes defined in section (4) of this act who suffer from disability. The cost of the administration of such additional compensation fund shall be paid from such fund. After the payment of all of said claims and expenses of administration of the board herein created all funds remaining in the hands of * * * service compensation board in excess of $3,000,000 shall revert to and become a part of the permanent school fund of the state";

11.   provides for exemption of all payments and allowances from taxation and from levy and sale on execution and exemption from taxation of all bonds issued;

12.   "To provide for the payment of the principal of said bonds so issued and sold and the interest thereon as the same become due and mature, there is hereby imposed and levied upon all of the taxable property within the state of Iowa in addition to all other taxes, a direct annual tax for each of the years said bonds are outstanding sufficient in amount for the payment of principal of said bonds as it shall become due, and sufficient in amount to produce additional sums as may be needed to pay the interest on said bonds for each year for twenty (20) years.   The treasurer of the state shall annually certify to the state tax commission prior to the time for levy of general state taxes the amount of money required to be raised to pay the principal and interest on such bonds maturing in the ensuing year, and said state tax commission shall annually fix the rate percentum necessary to be levied and assessed upon the valuation of the taxable property within this state to produce funds sufficient to pay the principal of and interest upon such bonds as the same become payable, and such additional annual direct tax shall be levied, certified, assessed and collected at the same time and in the same manner as are taxes for general state purposes";

13.   provides that if any part of the act shall be adjudged invalid by a court of competent jurisdiction such judgment shall affect only the part of the statute involved in the decision;

14.   provides for the submission of the measure to the people at the general election in November 1948 for their approval, "after legal publication".

Shortly after the election approving the measure, the treasurer of the state, in compliance with the provisions of the statute, issued his departmental order for the preparation, issuance and sale of bonds.   Apparently in anticipation of further legislation on the bonus matter by the Fifty-third General Assembly the sale of the bonds was delayed.   There was a large surplus in the general fund in the state treasury not earmarked or appropriated for specific purposes.   When the legislature convened in January 1949, it was urged that legislation be passed to appropriate from

said general fund to the "service compensation fund" required by chapter 59 of the Laws of the Fifty-second General Assembly, all or a large part of the money required to meet the payments to be made from said fund.

To accomplish this, Senate File 222 was adopted by the Fifty-third General Assembly, approved by the Governor on March 7, 1949, and became effective immediately on its publication. It is entitled:

"AN ACT relating to the payment of service compensation to persons who served in the armed forces of the United States as provided in chapter fifty-nine (59), Acts of the Fifty-second General Assembly; further providing the manner of the sale of bonds therein authorized, by prohibiting the sale of part of the bonds and by appropriating fifty million dollars ($50,000,000) to the service compensation fund therein created."

The preamble to the Act after reciting the authorization of the $85,000,000 bond issue and its purpose by said chapter 59, the designation of the form of each $1000 bond, all bearing date of December 2, 1948, as set out in the order of the treasurer, but not offered for sale, continued as follows:

"WHEREAS, the method of sale is not definitely prescribed in the act and it is deemed necessary to give the treasurer a specific plan of sale; and

"WHEREAS, it is the will of the General Assembly that $50,-000,000 of the general fund be used to pay part of the costs of the compensation provided in chapter 59; and

"WHEREAS, it is further the will of the General Assembly that the bonds so issued and sold under the authority of chapter fifty-nine * * * do not exceed thirty-five million dollars ($35,-000,000) and that they be sold only in groups as needed to finance the cost of the compensation set out in said chapter. Now Therefore: *Be It Enacted* * * *:"

The substance of the sections of the Act pertinent to the appeal are:

1. The appropriation from the general fund of the state

"not otherwise appropriated" of $50,000,000, to the service compensation fund established by said chapter 59;

2. the treasurer of the state is authorized and directed to sell $35,000,000 of bonds "as provided in chapter fifty-nine * * * and his authority and direction therein to sell in excess of said sum is hereby revoked";

3. the treasurer is directed to sell the bonds of $1000 each, in four groups of 8750 bonds each, in the manner provided in section 2 of said chapter 59, to wit, group 1 to be sold immediately with each bond maturing on or before December 2, 1953; group 2 (Nos. 8751 to 17,500, inclusive) maturing on or before December 2, 1958, but the sales are to be delayed until the funds appropriated in section 1 of the Act ($50,000,000) and the proceeds of group 1 have all been used for the payment of the compensation provided in said Act, chapter 59; group 3 (Nos. 17,501 to 26,250) maturing on or before December 2, 1963, and group 4 (Nos. 26,251 to 35,000) maturing on or before December 2, 1968, with the sales of each group (3 and 4) to be delayed until all of the appropriation and the proceeds of prior group sales shall have been paid out as provided in chapter 59;

4. "No debt in excess of * * * ($35,000,000) shall be contracted by authority of chapter fifty-nine * * * and the sale of bonds in excess of said amount is hereby expressly forbidden";

5. directs that if any part of the Act be adjudged invalid the entire Act will be invalidated.

After Senate File 222 became effective and on March 12, 1949, the treasurer of the state made an order, supplemental to his first departmental order of November 23, 1948, giving the details of the form, preparation, notice of sale and sale of 35,000 bonds of $1000 denomination each, with interest to be fixed by the treasurer at or prior to the time the bonds are sold, or at the rate fixed by the bidder, but not exceeding two and one-half per cent per annum payable semi-annually, and maturing serially and in numerical order in twenty equal annual installments of $1,750,000 on December 1 of each of the years 1949 to 1968, inclusive. This order was approved by the Governor and the secretary of state.

Plaintiff's petition filed March 14, 1949, challenged both

836

chapter 59 of the Laws of the Fifty-second General Assembly and Senate File 222 of the Laws of the Fifty-third General Assembly as violating a number of sections of the Constitution of Iowa, on various grounds. The supplemental order of the treasurer was also alleged to be repugnant to and violative of said chapter 59. Since these grounds are in substance recited in plaintiff's propositions relied on for reversal we will not note them here. Defendants' motion to dismiss the petition as not stating a cause of action and challenging the grounds of unconstitutionality alleged, was sustained by the trial court, and plaintiff having announced in open court his election to stand upon his petition, without further pleading, the district court rendered judgment and decree dismissing plaintiff's petition.

Plaintiff states nine propositions, based upon nine errors of the district court, upon which he relies for reversal. In substance they are as follows:

1. Failure to hold Senate File 222 unconstitutional as in contravention of section 6 of Article VII of the Constitution of Iowa, in that said Act attempted to amend chapter 59 (Acts of Fifty-second General Assembly).

2. Failure to hold Senate File 222 unconstitutional as in contravention of section 5 of Article VII, "in that said Act in effect contracts a debt by and on behalf of the State of Iowa without being first submitted to the people and receiving a majority of all votes cast for and against it."

3. Failure to hold Senate File 222 unconstitutional as in contravention of section 2 of said Article VII, in that it "created debts at different periods of time and in excess of $250,000."

4. Failure to hold said chapter 59 unconstitutional and in contravention of section 5 of said Article VII, in that it was not submitted to and approved by the people in accordance with the Constitution "as said chapter was not published in at least one newspaper in each county for the period of three months preceding the election at which it was submitted."

5. Failure to hold Senate File 222 and said chapter 59 each unconstitutional as in contravention of section 5 of said Article VII "in that said acts are not for a single work or object, distinctly specified therein."

6. Failure to hold each of said Acts unconstitutional as in contravention of section 29 of Article III of the Constitution of Iowa "in that said acts do not respectively embrace but one subject expressed in the title thereof."

7. Failure to hold each of said Acts unconstitutional as in contravention of section 5 of Article VII "in that said acts do not respectively make legal and sufficient provision for the payment of the bonds to be issued pursuant thereto and the interest thereon."

8. Failure to hold each of said Acts unconstitutional as in contravention of section 7 of said Article VII "in that said acts do not respectively, distinctly state the tax to be levied and the object to which it is to be applied."

9. Failure to hold the supplemental departmental order of March 12, 1949, in violation of and repugnant to said chapter 59, in that the total sum of the bonds of the order is less than the total sum of the bonds authorized in said chapter 59.

In no manner or way, other than as above set out does the plaintiff challenge, as a whole or in part, the constitutionality of either statute involved herein. He does not contend that the benefits authorized by chapter 59 violate any constitutional provision or exceed the legislative power of the General Assembly.

Since a number of the propositions urged by plaintiff pertain to claimed violations of Article VII—entitled "State Debts" —of the Constitution of Iowa, we refer to its pertinent sections before discussing the propositions. Section 1 of Article VII prohibits the extension of the credit of the state, in any manner, to any individual, association, or corporation, or the assumption by the state of their debts or liabilities. This section is not involved herein.

Section 2 provides that "the State may contract debts to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for", but the aggregate amount of such debts whether contracted by one or more acts, or at one or more times, shall never exceed $250,000.

Section 3 provides that all losses to the permanent school or university fund of the state, caused by the mismanagement or fraud of those in charge thereof shall be a permanent funded

debt against the state in favor of said fund. "The amount of liability so created shall not be counted as a part of the indebtedness authorized by the second section of this article."

Section 4 states that "in addition to the above limited power to contract debts, the State may contract debts to repel invasion, suppress insurrection, or defend the State in war * * *." Plaintiff does not contend that this section is involved or that it was violated. We note it only for later reference.

Section 5 provides: "Except the debts herein before specified in this article, no debt shall be hereafter contracted by, or on behalf of this State, unless such debt shall be authorized by some law for some single work or object, to be distinctly specified therein; and such law shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest on such debt, as it falls due, and also to pay and discharge the principal of such debt, within twenty years from the time of the contracting thereof; but no such law shall take effect until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt created thereby; and such law shall be published in at least one newspaper in each County, if one is published therein, throughout the State, for three months preceding the election at which it is submitted to the people."

Section 6 provides: "The Legislature may, at any time, after the approval of such law by the people, if no debt shall have been contracted in pursuance thereof, repeal the same; and may, at any time, forbid the contracting of any further debt, or liability, under such law; but the tax imposed by such law, in proportion to the debt or liability, which may have been contracted in pursuance thereof, shall remain in force and be irrepealable, and be annually collected, until the principal and interest are fully paid."

Section 7 provides: "Every law which imposes, continues, or revives a tax, shall distinctly state the tax, and the object to which it is to be applied; and it shall not be sufficient to refer to any other law to fix such tax or object."

■ I. The plaintiff in challenging the constitutionality of the legislative acts noted in his petition and asking that this court adjudge them to be in violation of the constitution has the burden of establishing that he is entitled to such relief. No presumption against the constitutional validity of either statute can be indulged. Every reasonable inference or presumption must be called to their support. The plaintiff must overcome these presumptions, and negative every reasonable basis which may sustain the statutes. Keefner v. Porter, 228 Iowa 844, 847, 293 N.W. 501; Loftus v. Department of Agriculture, 211 Iowa 566, 570, 232 N.W. 412; Ward v. Board of Supervisors, 214 Iowa 1162, 1168, 241 N.W. 26; Board of Supervisors v. Board of Supervisors, 214 Iowa 655, 677, 241 N.W. 14, 289 U. S. 708, 53 S. Ct. 697, 54 S. Ct. 47, 77 L. Ed. 1464; Priest v. Whitney Loan & Trust Co., 219 Iowa 1281, 1286, 261 N.W. 374; Tusha v. Eber- hart, 218 Iowa 1065, 1066, 256 N.W. 740; Dickinson v. Porter, 240 Iowa 393, 399, 35 N.W. 2d·66, 71, and authorities cited.

"The power to declare legislation unconstitutional is one which courts exercise with great caution, and only when such conclusion is unavoidable." Cook v. Hannah, 230 Iowa 249, 252, 297 N.W. 262, 264, 314 U. S. 691, 62 S. Ct. 361, 86 L. Ed. 553. Such an attitude has always been maintained by this court. Santo v. State of Iowa, 2 (Clarke) Iowa 165, 207, 63 Am. Dec. 487; State ex rel. Weir v. County Judge, 2 (Clarke) Iowa 280, 282; Miller v. Schuster, 227 Iowa 1005, 1015, 289 N.W. 702; Stewart v. Board of Supervisors, 30 Iowa 9, 13–17, 1 Am. Rep. 238; In re Estate of Pedersen, 198 Iowa 166, 171, 196 N.W. 785; Camaras v. Sioux City, 192 Iowa 372, 377, 184 N.W. 821; Dickinson v. Porter, supra, 240 Iowa 393, 399, 35 N.W. 2d 66, 71.

■ It is one of the fundamentals of the law, uniformly announced, that courts can declare an act void only when it violates the Constitution, clearly, palpably, plainly and beyond any reasonable doubt. In McGuire v. Chicago, B. & Q. R. Co., 131 Iowa 340, 348, 108 N.W. 902, 905, 33 L. R. A., N. S., 706, speaking through Justice Weaver, the court said:

"It is well, at the threshold of the discussion, to recall the familiar rule by which we are bound in passing upon any prop-

osition affecting the constitutionality of a legislative enactment. While it is an imperative duty, from which no court will shrink, to declare void any statute the unconstitutionality of which is made apparent, due regard to the boundary between the legislative and judicial departments of our government requires that this prerogative be exercised with the greatest caution, and only after every reasonable presumption has been indulged in favor of the validity of the act."

The rule and reasons for it are well expressed by Justice Evans in State v. Fairmont Creamery Co., 153 Iowa 702, 706, 707, 133 N.W. 895, 897, 42 L. R. A., N. S., 821:

"To speak accurately, the constitutionality of an act is not dependent upon an affirmative holding to that effect by the court. It is the province of the court only to determine whether a legislative act in question is or is not 'clearly, plainly, and palpably' unconstitutional. The legislative and executive departments of government are under the same responsibility to observe and protect the Constitution as is the judicial department. This responsibility is always present in the enactment by the Legislature, and approval by the executive, of all legislation. The constitutionality of all proposed legislation must be determined in the first instance by such co-ordinate branches of the government. Within the zone of doubt and fair debate such determination is necessarily conclusive. For the court to enter that zone would of itself be an offense against the Constitution. But when a legislative act is clearly and unmistakably unconstitutional, then the court must so declare."

It is a well-established principle, often applied by this court, that courts must construe a statute so as to avoid, if possible, holding it void for unconstitutionality. Cook v. Marshall County, 119 Iowa 384, 402, 93 N.W. 372, 104 Am. St. Rep. 283; Santo v. State of Iowa, supra, 2 (Clarke) Iowa 165, 207, 63 Am. Dec. 487; City of Des Moines v. Manhattan Oil Co., 193 Iowa 1096, 1117, 184 N.W. 823, 188 N.W. 921, 23 A. L. R. 1322; Rowley v. Clarke, 162 Iowa 732, 754, 144 N.W. 908; State v. Talerico, 227 Iowa 1315, 1322, 290 N.W. 660.

The principles of law stated above have been uniformly ad-

hered to by this court. See, in addition to cases cited, Morrison v. Springer, 15 Iowa 304, 347, 348; Youngerman v. Murphy, 107 Iowa 686, 693, 694, 76 N.W. 648; Sisson v. Board of Supervisors, 128 Iowa 442, 464, 104 N.W. 454, 70 L. R. A. 440; State v. Strayer, 230 Iowa 1027, 1029, 299 N.W. 912; Decker v. American University, 236 Iowa 895, 903, 20 N.W. 2d 466; Burlington and Summit Apts. v. Manolato, 233 Iowa 15, 18, 7 N.W. 2d 26, 144 A. L. R. 251; Carlton v. Grimes, 237 Iowa 912, 941, 23 N.W. 2d 883; Carroll v. City of Cedar Falls, 221 Iowa 277, 280, 261 N.W. 652; Gallarno v. Long, 214 Iowa 805, 817, 243 N.W. 719; State v. Woitha, 227 Iowa 1, 4, 287 N.W. 99, 123 A. L. R. 884.

II. Plaintiff's first proposition is that the court erred in failing to hold that Senate File 222 violated section 6 of Article VII of the Constitution in that it was an attempted amendment of chapter 59 of the Laws of the Fifty-second General Assembly.

We do not agree with this contention. While Senate File 222 does not expressly state that it "amends" said chapter 59, its wording throughout clearly states that it is an amendment to, and a modification of, chapter 59, and that it was the definite intention of the legislature that chapter 59 should be effective and enforced as amended and modified by said Senate File 222. Chapter 59 authorized a debt to be contracted as permitted by and under the provisions of section 5 of Article VII of the Constitution. Under section 6 of said Article, if no debt is contracted under chapter 59 the legislature may repeal the law contained in the chapter. The section also expressly provides that said chapter may be repealed in part by forbidding the contracting of any part of the authorized debt not then contracted. Such repeal in part could be effected by the legislature only by an act on its part amending the original chapter. This forbidding of the contracting "of any further debt" is permitted and authorized by section 6 notwithstanding it effects a reduction of the original amount of the debt approved by the vote of the electors. Neither section 6 nor any other provision of the Constitution contains a mandate or inhibition that the forbidding or reduction of the debt authorized by section 6, in order to be valid or effective, must be submitted to and receive the approval of the voters. If, under section 6, all of the authorized debt may be canceled by

842

the legislature before any of it is contracted, and the remainder may be canceled after part 'of it is contracted, the canceling of part of the authorized debt and the contracting of the remainder would be authorized under a reasonable construction of the section. Certainly, there is no express or implied prohibition in the section against doing this.

Plaintiff has cited no provision of the Constitution of Iowa nor any decision of this court nor authority of any kind, nor any sound reason, that the amendment or modification of chapter 59 by Senate File 222 violated section 6 of Article VII or any other provision of the Constitution. We have found no provision of the Iowa Constitution, no precedent or authority supporting plaintiff's contention.

Section 1 of the title "Legislative Department" in Article III of the Constitution of Iowa provides: "The Legislative authority of this State shall be vested in a General Assembly * * *." Section 9, under the same title and Article, provides that each house "shall have all other powers necessary for a branch of the General Assembly of a free and independent State." Section 1 of Article XII of the Constitution provides: "* * * The General Assembly shall pass all laws necessary to carry this Constitution into effect."

This court, in construing these provisions of the Constitution from its earliest to its latest pertinent decisions, has held that all legislative power and authority of the state not delegated to the Federal Government nor prohibited by some provision of the State or Federal Constitution, either expressly or by clear implication, is vested in the General Assembly. In McMillen v. County Judge, 6 (Clarke) Iowa 390, 394, is language quite apropos to the case before us, to wit:

"The true inquiry, however, is, whether the exercise of the power is inhibited. *In ascertaining the power of the legislature under the constitution, we look, not to what the instrument authorizes to be done, but to what is prohibited.* In this case there is no provision prohibiting, either expressly, or by implication, such legislation." (Italics ours.)

In Eckerson v. City of Des Moines, 137 Iowa 452, 465, 115 N.W. 177, 182, the court said:

"As applied to the legislative department, the Constitution of the State is a limitation, and not a grant of power. Hence the courts look not at what the instrument authorizes, but at what is prohibited."

In Stewart v. Board of Supervisors, 30 Iowa 9, 18, 1 Am. Rep. 238, 244, the court said:

"The second section of the 'bill of rights' declares: *'All political power is inherent in the people.'* Political power consists of the three great attributes of sovereignty, namely: *legislative, executive* and *judicial* authority. This is *all inherent* in the people. * * * By section 1 of article 3 of the constitution, we find that *'The* legislative authority of this State shall be vested in a general assembly,' etc.

"The people, then, have vested *the* legislative authority, *inherent in them,* in the general assembly. * * * Subsequently, in the same instrument, they withdraw some portions of this authority and impose certain restrictions upon the exercise of the authority granted. It follows, therefore, as a logical sequence, that, within these limitations and restrictions, the legislative power of the general assembly is supreme; that it is bounded only by the limitations *written* in the constitution. * * *

"Thus, it seems clear by logical deduction, and upon the most abundant authority, that this court has no authority to annul an act of the legislature unless it is found to be in clear, palpable and direct conflict with the written constitution." (Italics are not ours.)

In Morrison v. Springer, 15 Iowa 304, 342, the court said:

"* * * the Legislature clearly has the power to legislate on all rightful subjects of legislation, unless expressly prohibited from so doing, or where the prohibition is implied from some express provision. This theory must never be lost sight of by courts in examining the powers of the Legislature. It is elementary, cardinal, and possesses frequently controlling weight in determining the constitutional validity of their enactments."

In Boyd v. Ellis, 11 Iowa 97, 100, the court said: "While Congress possesses only such powers as are specifically granted or necessary to carry out a given power, the legislature possesses sovereign legislative power over all subjects, except such as are prohibited in the State Constitution." For a like statement see Purczell v. Smidt, 21 Iowa 540, 544. In McGuire v. Chicago, B. & Q. R. Co., supra, 131 Iowa 340, 355, 356, 108 N.W. 902, 907, 33 L. R. A., N. S., 706, a well-considered and often-quoted decision, the court said:

"Courts do not sit to revise or review legislative action, and if they hold an act invalid it is because the Legislature has failed to keep within the express or clearly implied limitations of the Constitution. * * * Except when the Constitution has imposed limits upon the legislative power, it must be considered practically absolute."

In Campbell v. Jackman Bros., 140 Iowa 475, 491, 118 N.W. 755, 761, 27 L. R. A., N. S., 288, the court said:

"The Constitution as it is written affords the one and only safe anchorage. It operates, not as a grant of power to the State or to its General Assembly, but as a limitation thereon, and all powers not thereby expressly or impliedly withheld may be constitutionally exercised."

By the tenth amendment to the Constitution of the United States "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Except as limited by express or clearly implied provisions of the Federal or State Constitution the General Assembly has very broad power and authority, vested in it by the people, for the enactment of all legislation. This court has so held without variation. For the later decisions see Loftus v. Department of Agriculture, supra, 211 Iowa 566, 569, 232 N.W. 412; Gallarno v. Long, supra, 214 Iowa 805, 818, 243 N.W. 719; Carroll v. City of Cedar Falls, supra, 221 Iowa 277, 280, 261 N.W. 652; Carlton v. Grimes, supra, 237 Iowa 912, 943, 944, 23 N.W. 2d 883, and Dickinson v. Porter, supra, 240 Iowa 393, 399, 35 N.W. 2d 66, 71, wherein we said: "We have

pointed out repeatedly the General Assembly has power to enact any kind of legislation it sees fit provided it is not clearly and plainly prohibited by some provision of the State or Federal Constitution."

Chapter 59 as enacted by the legislature did not offend against section 5 or any other section of Article VII. It was approved at the general election. As amended by Senate File 222 (chapter 49, Acts of Fifty-third General Assembly) chapter 59 was in no way obnoxious to any section of said article, nor to the approval of the voters. It complied with all the provisions of section 5. It, in no way, affected or changed the single object of chapter 59, the amount of the service compensation fund or its administration, the beneficiaries or the amount of the benefits, the character or rate of the tax, the ultimate payment of the debt contracted within twenty years.

Chapter 59 was amended and modified by Senate File 222 only in the following respects: 1. It states in the fourth paragraph of the preamble, "the method of sale is not definitely prescribed in the act [chapter 59] and it is deemed necessary to give the treasurer a specific plan of sale"; 2. an appropriation of $50,-000,000 was made from the general fund of the state, not otherwise appropriated, to the service compensation fund, which contribution of cash assets thereto reduced the need of an authorized debt from $85,000,000 to $35,000,000, with like reduction in the amount of the bond issue, and a proportionate reduction in the tax imposed and to be levied; 3. it revoked the authority and direction of the Treasurer of State to sell bonds in excess of $35,-000,000, and expressly forbade the contracting of any debt in excess of $35,000,000, and the sale of bonds in excess of said amount.

The constitutional convention of Iowa drew liberally from the Constitution of New York in the drafting of our Constitution of 1857, and followed it very closely in those provisions pertaining to state debts. Although the New York Constitution has been amended in some respects in those matters, the Constitution of Iowa has been little, if any, changed. The New York legislature authorized the contracting of a large indebtedness in the establishment and maintenance of the Erie and other canals, under

constitutional provisions very like those in Article VII of the Iowa Constitution. Later legislation was passed providing for alterations in the canal routes, and injunctions were sought to prevent these changes upon the ground that the legislation was an attempt to amend the earlier statutes which had been approved by the voters, without submitting the amendment to the voters. The injunctions were denied in each case. See People ex rel. Jordan v. Wotherspoon, 94 Misc. 419, 157 N. Y. Supp. 923; Kibbee v. Lyons, 118 Misc. 172, 192 N. Y. Supp. 696, and Kibbee v. Lyons, 202 App. Div. 562, 195 N. Y. Supp. 563, 566. In the last opinion at page 565 of 202 App. Div., it was stated:

"Section 4 [which corresponds to section 5 of Article VII of the Iowa Constitution] provides: 'Except the debts specified in sections two and three of this article (these provide for meeting casual deficiencies and debts to repel invasions, suppress insurrections or defend the State in war), no debts shall be hereafter contracted by or on behalf of this State, unless such debt shall be authorized by law, for some single work or object, to be distinctly specified therein * * *. No such law shall take effect until it shall, at a general election, have been submitted to the people, and have received a majority of all the votes cast for and against it at such election. * * *.' *The vote of the people was not taken for the purpose of specifically and in detail indorsing the plans for the canal, but rather to authorize the contracting of indebtedness in behalf of the State for the single specified work of improving the canals of the State.* * * * Many changes in the original plans for the construction of the Barge canal have been made. * * * But, regardless of the changes in detail, the 'single work or object,' for which the indebtedness of the State was authorized, was being carried out and the public moneys borrowed expended thereon. The Legislature, without a vote of the people, had not the power to amend the Barge Canal Act in such manner as to divert these State funds to a work other than the single work or object contemplated when the Barge Canal Act was approved, *but it could amend the act and the plans for the canal in any respect which did not so divert the funds or interfere with or destroy that 'single work or object.'* See People ex rel. Jordan v. Wotherspoon, 176

App. Div. 947, 162 N. Y. Supp. 1138, affirming 94 Misc. Rep. 419, 157 N. Y. Supp. 923.

"*We think the above act amending the Barge Canal Act was a lawful exercise of the Legislative power lodged in the Senate and Assembly.* Article 3, section 1, of the Constitution provides:

'*The legislative power of this State shall be vested in the Senate and Assembly.*' The legislative power rests exclusively in the Senate and Assembly; except so far as the Constitution itself has placed it otherwise, the Senate and Assembly cannot release its power, nor delegate it to another. *Our State Constitution contains no general provision for submitting acts of the Legislature to a referendum.* The only sections of our Constitution which have a bearing here are sections 4 and 10 of article 7 above quoted, and they are intended to put restrictions upon the legislative power in respect to creating an indebtedness in behalf of the State and to limit the expenditure of State moneys borrowed to the single work or object distinctly specified in the referendum act. *They put no other restriction upon the power of the Legislature to amend any act which has been approved by the votes of the people.*" (Italics ours.)

The latter part of section 4 of Article VII of the New York Constitution is substantially like section 6 of Article VII in the Constitution of Iowa. On page 567 of 202 App. Div., page 567 of 195 N. Y. Supp., supra, the court said:

"We think the Constitution authorizes the Legislature to abandon this separate spur [of the canal]. In section 4 of article 7 is this:

'The Legislature may, at any time after the approval of such law by the people (in this case the Barge Canal Act) if no debt shall have been contracted in pursuance thereof, repeal the same; and may at any time, *by law*, forbid the contracting of any further debt or liability under such law.' *No debt has been contracted or obligation incurred in connection with this spur and the spur cannot be constructed without contracting further debt or liability.*

"We conclude that this portion of the old Erie Canal in the lumber district is no longer necessary or useful for canal pur-

poses of the State; that it is no part of the Barge canal improvement; that the abandonment of this part of the work is not a radical or fundamental change from the single work or object for which the moneys of the State were appropriated; *and that the Legislature is entirely justified in concluding that it will not * * *· contract any further debt or liability therefor."* (Italics ours.)

It will be noted that the words "by law", italicized above, are not in the corresponding section 6 of Article VII of the Iowa Constitution. But it is definitely there by plain implication, because a legislature can act only by bills which it adopts as statutory laws.

What was held by the New York court applies with as good or better reasons to the case before us. Here the authorized debt burden of the taxpayers was greatly reduced both in principal and interest. Of the authorized debt, $50,000,000 was canceled and was not contracted, because of the appropriation of that sum from the cash assets of the state to the service compensation fund. This was a substantial saving to the taxpayers in interest, without the slightest disadvantage to the beneficiaries of chapter 59. There are no prohibitory restrictions in the Constitution, by expression or limitation, forbidding the enactment of any provision of Senate File 222. Plaintiff does not contend that the appropriation of $50,000,000 violated any constitutional provision. In view of the decisions cited herein such contention would have had no foundation. All legislative power respecting state debts, inherent in the people, was by them vested in the General Assembly except the money limit in section 2 of Article VII, and the special referendum in section 5 of that article. This referendum also has its limitations. It gives the voters a right of approval or disapproval with respect to the particular legislation submitted to them under section 5. That is the limit of their authority. After their approval of the act, it may be repealed, or modified within limitations, by the legislature, without the consent of the voters. Having vested all legislative authority pertaining to state debts except as reserved by the limitations in Article VII, the people have no authority to initiate legislation,

formulate legislative policy, nor to amend or repeal legislative acts of the General Assembly.

A repetition of what the court, through Justice Evans, said in State v. Fairmont Creamery Co., supra, 153 Iowa 702, 711, 133 N.W. 895, 899, 42 L. R. A., N. S., 821, may not be out of place, namely:

"The Constitution was intended to announce certain basic principles to serve as the perpetual foundation of the state. It was not intended to be a limitation upon its healthful development, nor to be an obstruction to its progress. New days bring new problems. Legislation must meet these problems as they come; otherwise our plan of government must prove inadequate. Manifestly, we ought not to be swift to adopt such a technical or strained construction of the Constitution as would unduly impair the efficiency of the Legislature to meet its unavoidable responsibilities."

The adoption of Senate File 222 by the Fifty-third General Assembly and its approval by the Governor of the State does not contravene any provisions of section 6 of Article VII of the Iowa Constitution.

III. Plaintiff insists that the court erred in not holding Senate File 222 unconstitutional as violating section 5 of Article VII in that it "in effect" contracts a debt of $35,000,000 without the approval of the voters.

The answer to this proposition is that Senate File 222 does not contract such a debt, or any debt "in effect" or in fact. It amends chapter 59, not by authorizing, creating, adopting or contracting the debt of $85,000,000 authorized by said chapter, or any part thereof, but by canceling $50,000,000 of the debt there authorized, and thereby reducing it to $35,000,000. Neither does Senate File 222 authorize or create a new debt of $35,000,000. It simply limits the debt authorized by chapter 59 to $35,000,000. That is clearly the meaning of its unambiguous language, and the plain intention of the legislature. Since Senate File 222 neither authorized, created nor contracted a debt of $35,000,000, there was no requirement that it be submitted to a vote of the electors. If it could be said that it "in effect" contracted such a debt, which

was but a part of the larger debt which the voters had already approved, by no fair construction of section 5 would a second approval of the lesser sum be required.

IV. Plaintiff's third complaint is that the court erred in not holding Senate File 222 void as in violation of section 2 of Article VII since it created and contracts debts in excess of $250,-000. What we have said in the preceding division, namely, that Senate File 222 creates and contracts no debt, is a sufficient answer to this contention. The voters' approval of the $85,000,000 debt authorized by chapter 59 necessarily was an approval of the balance of said debt amounting to $35,000,000 to which the original debt had been reduced by Senate File 222. All requirements of section 5 of Article VII with respect to the voters' approval of the reduced debt of $35,000,000 were met.

The $250,000 limitation in said section 2 of Article VII applies only to the debts contracted under that section. It applies only to debts contracted "to supply casual deficits or failures in revenues, or to meet expenses not otherwise provided for." It has no application to debts arising under section 3 of the Article. The last sentence of that section so states, to wit, "The amount of liability so created shall not be counted as a part of the indebtedness authorized by the second section of this article." The $250,-000 limitation of section 2, under no reasonable construction, could apply to debts contracted under section 4 of Article VII. A debt so limited would pay but a minute part of the debts incurred in repelling invasion, suppressing insurrection or defending the state in war. Section 5 of Article VII eliminates the limitation of section 2 by stating in the first line, to wit, "Except the debts herein before specified in this article * * *."

An examination of Volume I of the Debates of the Constitutional Convention, page 261 et seq., shows that section 2 of Article VII as first proposed had a debt limit of $100,000. It provoked considerable debate. Delegate Alpheus Scott, who favored a low limit, on February 5, 1857, said:

"There is another view of this matter which I hope members will take, and that is; that should any contingency arise where it would be absolutely necessary for the State to have more means

than this section now provides, this report has abundantly provided for that matter, *by allowing the legislature to submit a proposition to the people for whatever expenditure might be desired * * *."* (Italics ours.)

Delegate Scott was referring to that part of the report which was adopted as section 5 of Article VII. Propositions to fix the amount at $500,000, $400,000, $350,000, and $300,000 were each voted down. The limitation of $250,000 was carried by a vote of 16 ayes to 11 nays.

A similar objection was made to the Soldiers' Bonus Act of World War I in chapter 332 of the Laws of the Thirty-ninth General Assembly. In discussing the various sections of Article VII, the court in Grout v. Kendall, 195 Iowa 467, 471, 192 N.W. 529, 530, speaking through Justice Evans, said:

"By way of preliminary observation, let it be noted that Section 1 is an unqualified *prohibition*. Whatever is prohibited thereby is prohibited without benefit of clergy. But Sections 2, 3, 4, and 5 are each a qualified *permission* to contract debt. Under Section 2, the purposes for which the debt may be contracted are general and undefined, but the power to contract is qualified by a maximum * * * in *amount*; but the *object* for which an unlimited indebtedness may be created is limited and specific. The same may be said of Section 4. Under Section 5, a wide door and an open sky are offered, provided that the indebtedness created thereunder shall be approved by a referendum to the electorate. No maximum is fixed." (The italics are not ours.)

We find no merit in plaintiff's proposition discussed in this division.

V. The fourth proposition which plaintiff urges for reversal is the claimed error of the court in failing to hold chapter 59 void and violative of section 5 of Article VII, in that it was not submitted and approved by the people in accordance with the Constitution of Iowa, since said chapter was not published as required by section 5 of Article VII.

Section 5 requires that the proposed law "shall be published in at least one newspaper in each County, if one is published

therein, throughout the State, for three months preceding the election at which it is submitted to the people."

Section 6.2, Code of Iowa, 1946 (3 I. C. A., section 6.2, page 240) is as follows:

"Publication of proposed public measure. Whenever any public measure has passed the general assembly which under. the constitution must be published and submitted to a vote of the entire people of the state, the secretary of state shall cause the same to be published, once each month, in at least one newspaper of general circulation in each county in the state, for the time required by the constitution."

The facts are, as alleged in plaintiff's petition and admitted by defendants in their motion .to dismiss, that the notices were published in at least one newspaper of general circulation in each county in Iowa once each month during the months of August, September and October 1948 preceding the general election of November 2, 1948, except that in one county publication was made five times—four times in August and once in October.

A substantial vote was cast on the proposition—over 950,000 —of which number approximately eighty per cent voted for the bill. There was a good-faith attempt to comply with the statute and the Constitution with respect to the notice. The defect or irregularity was exceedingly slight, and the compliance was exceptionally substantial. The failure was in but one county out of ninety-nine and in but one month. There is nothing to indicate that the five publications were not just as effective as though one of them had been in September.

In 29 C. J. S., Elections, section 74, page 100, it is stated:

"Substantial compliance with a statutory provision that notice of a coming election shall be published in one or more newspapers for a certain time before election day is all that is required; and an election which has been duly ordered will not be vitiated by a mere irregularity in the publication of the notice, or because the notice was not published for the required time, in the absence of a showing that the want of full notice deprived

some portion of the electors of their right to vote, and that their votes would have changed or rendered the result doubtful * * *."

It is a quite general rule that statutory directions as to the time and manner of giving notice of an election are mandatory and will be upheld strictly *before* an election, but that in an action brought *after* an election has been held, substantial compliance is sufficient—the reason being that after the election has been held and the will of the voters has been fairly expressed the courts will seek to sustain it by a liberal construction of the applicable statutes and treat them as directory. See Kerby v. Griffin, 48 Ariz. 434, 62 P. 2d 1131, 1138; State ex rel. McNeill v. Long, 178 Okla. 409, 63 P. 2d 60, 62; Weisgerber v. Nez Perce County, 33 Idaho 670, 197 P. 562, 563; Vickers v. Schultz, 195 Wash. 651, 81 P. 2d 808, 810; State ex rel. Thompson v. Winnett, 78 Neb. 379, 110 N.W. 1113, 10 L. R. A., N. S., 149, 15 Ann. Cas. 781; Mayer v. Adams, 182 Ga. 524, 186 S. E. 420, 424; Albuquerque v. Water Supply Co., 24 N. M. 368, 174 P. 217, 5 A. L. R. 519, 525.

In Dishon v. Smith, 10 Iowa 212, 218, the court said:

"Upon considerations like these the courts have held that the voice of the people is not to be rejected for a defect, or even a want of notice, if they have, in truth, been called upon and have spoken. In the present case, whether there were notices or not, there was an election and the people of the county voted, and it is not alleged that any portion of them failed in knowledge of the pendency of the question, or to exercise their franchise."

As said in McLeland v. Marshall County, 199 Iowa 1232, 1251, 201 N.W. 401, 203 N.W. 1, 2: "It is not a case of no notice. In such a case, prejudice must be shown, in order to defeat an election." See also Younker v. Susong, 173 Iowa 663, 670, 671, 156 N.W. 24; McDunn v. Roundy, 191 Iowa 976–983, 181 N.W. 453; State ex rel. Cook v. Birdsall, 186 Iowa 129, 131, 132, 169 N.W. 453.

In Grout v. Kendall, supra, 195 Iowa 467, 192 N.W. 529, the sufficiency of the notice of the submission of the Soldiers' Bonus Law (chapter 332, Acts of Thirty-ninth General Assem-

bly) for the approval of the voters at the general election in November 1922 was challenged. The constitutional order for publication was identical with the one in this case. The publications were in July, August and September of 1922, instead of August, September and October of that year. In its opinion sustaining the Act the court was not specific in ruling on this proposition, but it said at pages 475, 476 of 195 Iowa, page 532 of 192 N.W.:

"The act under consideration complies in its terms and specifications with all the conditions imposed by this section. [Section 5 of Article VII, Constitution of Iowa.] The act as thus formulated and enacted by the legislature and approved by the executive was duly submitted at the general election in 1922, to the voting population, and was duly ratified by an undisputed majority of the votes cast. When this much has been said, it leaves little room for debate. We see lacking no requisite material to the validity and efficacy of the act. We hold, therefore, that the act is not in violation of Section 5 of Article 7, but that it is strictly conformable therewith. * * * Careful examination of each specification satisfies us that appellant's strongest points relate to the sections which we have here considered, and that none of the other specifications present questions of serious doubt. *We hold that no one of them is well taken.*" (Italics ours.)

The irregularity in the notice complained of did not vitiate the approval of the voters.

VI. Plaintiff complains because the court refused to hold Senate File 222 and chapter 59 each unconstitutional as in contravention of section 5 of Article VII "in that said acts are not for a single work or object, distinctly specified therein."

In his argument, plaintiff asserts that taken together chapter 59 and Senate File 222 do not set forth a single work or object, in that chapter 59 provides three objects for which the debt is to be incurred and the bonds issued, namely: (1) Compensation for all who served in World War II between specified dates (2) for the creation of an additional fund to ameliorate the condition of those so serving, who suffer from disability, and (3) for the reversion of any funds in excess of $3,000,000 remaining after

the payment of all service and disability claims, and the expense of administration, to the permanent school fund of the state.

There can be no serious controversy over the singleness of purpose and the unity of object with respect to items (1) and (2). Clearly, they were both solely for the benefit of those who served in World War II. Such was the decision of this very question in Grout v. Kendall, supra, 195 Iowa 467, 192 N.W. 529, which involved the constitutionality of the Soldiers' Bonus Act of World War I. That Act was apparently used as a model in drafting the bonus statute in the appeal at bar, as the corresponding provisions of each are substantially identical. The purposes noted in items (1) and (2) were in substance the same in each Act.

But the purpose stated in item (3) was not in the bonus law construed in the Grout case. Looking back in this opinion to the title to chapter 59, this provision will be noted therein, to wit, "providing for the application of any surplus to the retirement of the indebtedness herein created." This provision was also in the title of the Soldiers' Bonus Act in chapter 332 of the Laws of the Thirty-ninth General Assembly, and in keeping therewith in section 8 in the body of that Act is this provision: "All funds remaining in the hands of the bonus board after December 31, 1924, in excess of the two million dollars ($2,000,000) disability fund, shall be applied to the payment of the debt herein created."

It appears probable that when chapter 59 was first drafted it contained a similar provision to the one just quoted from section 8 of the earlier law, but, as an afterthought, there was substituted therefor in section 10 of the present Act the provision that any funds remaining "in excess of three million dollars ($3,000,000) *shall revert to and become a part of the permanent school fund of the state.*" The title of the Act, however, was not corrected to conform to the change in the body of the Act. It would have been much safer and sounder legislation had the "afterthought" been forgotten. It affords the only potential basis for the attack upon the constitutionality of the Act discussed in this division.

It cannot be fairly said that the use of any part of the money realized from the debt authorized and contracted as a part of the permanent school fund was any legitimate part of the object of

providing service and disability compensation to those who served in World War II or had any natural or intrinsic connection therewith.

But in our judgment neither can it be fairly said that the placing of any part of the funds in the permanent school fund was in fact a work or object of the authorization of the debt, nor was it so intended by the legislature, or so considered by the voters. The movement prompting the bonus statute and the authorization of the $85,000,000 and the sole object of the legislature and the voters was to compensate the service men and women for their services and disability. The fact that an uncertain residuum of the fund might go to the school fund, in all probability, was not an inducing cause in the mind of any voter.

The legislature had no definite knowledge whether the service compensation fund would exceed or fall short of the demands upon it, nor could it accurately estimate the expenses of administration or the disability needs. It knew that some who were entitled might not take advantage of the benefits. Realizing that some unexpended funds might remain as an incident to the operation of the Act; it provided that any such sum would go into the permanent school fund, which is the recipient of numerous casual receipts. Any part of the proceeds of the sale of the bonds which may go into the permanent school fund will do so not as an object or purpose of the debt authorized, but merely as a by-product thereof. We find no merit in this proposition of plaintiff.

VII. Plaintiff's sixth complaint is that both Acts violate section 29 of Article III of the Constitution which provides: "Every act shall embrace but one subject, and matters properly connected therewith; which subject shall be expressed in the title."

Plaintiff lists twelve separate subjects in chapter 59 and three in Senate File 222, and asserts that the two acts do not respectively embrace one subject matter which is adequately expressed in the title. Among the matters listed in chapter 59 are: Authorizing of $85,000,000 debt, authorizing treasurer to issue bonds for $85,000,000, appropriating this money to service compensation fund, providing for its disbursement, creating board, prescribing duties of board, providing disability fund,

providing surplus shall go to school fund, suspending bonds from taxation, providing for levy of taxes, providing for certification levy and collection of taxes, and providing for submission of the act to the voters.

In Senate File 222 plaintiff lists as separate subjects: the appropriation of $50,000,000, reduction of the debt to $35,000,000, and directing the manner of disposing of the reduced amount of bonds.

The mere statement of these claimed separate subjects in chapter 59 is sufficient answer to the proposition urged by plaintiff. No one of them is a separate subject, but each one on its face clearly shows that it is but a single step, matter or procedure in effecting the accomplishment of the single subject expressed in the title of the Act, namely, the authorizing of a debt and bond issue of $85,000,000 to provide for service compensation and disability funds for those in the armed forces of the United States within a specified period, and their successors in interest. All of these separate matters are congruous and connected with, germane, related, incidental and auxiliary to, and a part of, said single subject. Inclusion of these matters in the body of the Act or in the title do not offend against section 29 of Article III. The title need express only the subject of the Act and not the matters properly connected therewith, although including any of the latter in the title does not violate the section. The purpose of the section and the principles here stated have been many times announced by this court. What we have said applies also to Senate File 222. Neither statute violates the section. See Independent Sch. Dist. v. Iowa Employment Sec. Comm., 237 Iowa 1301, 1312, 1313, 25 N.W. 2d 491; McKinley v. Clarke County, 228 Iowa 1185, 1188, 1189, 293 N.W. 449; State v. Cowen, 231 Iowa 1117, 1131, 1132, 3 N.W. 2d 176; Davidson Bldg. Co. v. Mulock, 212 Iowa 730, 735–739, 235 N.W. 45; Chicago, R. I. & P. Ry. Co. v. Rosenbaum, 212 Iowa 227, 236–238, 231 N.W. 646; Wise v. Palmer, 165 Iowa 731, 742–745, 147 N.W. 167; Carlton v. Grimes, supra, 237 Iowa 912, 944–946, 23 N.W. 2d 883.

We have many times held that this section of the Constitution should receive a broad and liberal construction, and not a narrow, technical, critical construction. McAunich v. Missis-

sippi & M. R. Co., 20 Iowa 338, 341, 342; Beaner v. Lucas, 138 Iowa 215, 217–219, 112 N.W. 772; Beresheim v. Arnd, 117 Iowa 83, 89–91, 90 N.W. 506; State v. Gibson, 189 Iowa 1212, 1220 et seq., 174 N.W. 34; Fevold v. Board of Supervisors, 202 Iowa 1019, 1033, 1034, 210 N.W. 139; In re Estate of Pedersen, supra, 198 Iowa 166, 175, 196 N.W. 785.

Plaintiff complains that the title to chapter 59 states that any surplus shall be applied to the retirement of the debt, but that no such provision is found in the body of the Act. This does not violate the section. As stated in State v. Shroeder, 51 Iowa 197, 201, 1 N.W. 431, 434: "The fact that the title contains matter not of the subject of the act does not bring it in conflict with the constitutional provision under consideration." The constitutional section itself requires only that the subject be expressed in the title. Burlington and Summit Apts. v. Manolato, supra, 233 Iowa 15, 18, 7 N.W. 2d 26, 144 A. L. R. 251.

Under the proposition in this division, plaintiff urges that the provision that any surplus shall revert to the permanent school fund, is in the body of the Act, but is not mentioned in the title. We have answered a similar complaint in a preceding division. But we here note, by way of argument only, that if it be conceded that the permanent school fund provision is a distinct subject not expressed in the title, and violative of the Constitution, this fact does not aid the plaintiff; and does not render the remainder of the Act invalid, because the latter is severable from and wholly independent of it and complete and adequate in itself. We have repeatedly so held. In Davidson Bldg. Co. v. Mulock, supra, 212 Iowa 730, 756, 235 N.W. 45, 56, the court said:

"It is a rule of universal application that a statute may be valid in part, and invalid in another part, and if the invalid part is severable from the remainder, the portion which is valid may stand while that which is void may be stricken out and rejected, if after the elimination of the void portion, the remaining provisions are sufficient to be effective and accomplish their purpose in accordance with the legislative intent * * *."

For like decisions see State v. Santee, 111 Iowa 1, 7–10, 82 N.W. 445, 53 L. R. A. 763, 82 Am. St. Rep. 489; City of Dubuque

v. Chicago, D. & M. R. Co., 47 Iowa 196, 216, 217; Henkle v. Town of Keota, 68 Iowa 334, 342, 27 N.W. 250; Peverill v. Board of Supervisors, 201 Iowa 1050, 1059, 205 N.W. 543.

VIII.   In proposition VII plaintiff asserts that both acts involved herein are unconstitutional and void in that they do not make legal and sufficient provision for the payment of the principal and interest on the bonds to be issued, and thus violate section 5 of Article VII.

Senate File 222 does not purport to authorize a debt or to impose and provide for the collection of a direct annual tax sufficient to pay the interest on the debt as it falls due, and to pay and discharge the principal of such debt within twenty years from the contracting thereof.  Senate File 222, in each direction given to the Treasurer of the state respecting the issuance and sale of all bonds, expressly specifies that it is to be done "as provided" in chapter 59.  Plaintiff's complaint is therefore properly directed only to chapter 59 as amended by Senate File 222.

Section 5 of Article VII provides that the debt law authorized "shall impose and provide for the collection of a direct annual tax, sufficient to pay the interest" as it falls due, and to discharge the principal within twenty years from the contracting of the debt.  Chapter 59, as amended, fully meets these requirements by the provisions of section 12, herein set out in full.  We will not repeat them.  Each year the state treasurer has all the data for ascertaining the exact amount of the principal and interest due in the ensuing year.  These amounts are certified to the state tax commission, which fixes the tax rate necessary to be assessed and levied upon all the taxable property in the state to produce sufficient funds to pay the principal and interest of such bonds as the same become payable, which direct annual tax is levied, certified, assessed and collected at the same time and in the same manner as are taxes for general state purposes.  The ascertainment of the millage and the amount of the tax is merely a matter of mathematical computation.  The complaint of the plaintiff is without merit.

IX.   Plaintiff's eighth proposition relied on for reversal is that chapter 59 and Senate File 222 are unconstitutional because they violate section 7 of Article VII in that they "do not

respectively state the tax to be levied and the object to which it is to be applied." We have already held herein that the object is distinctly stated in chapter 59. Senate File 222 does not purport to state either the tax or its object.

Section 7 of Article VII is set out herein. This court has never definitely decided just what the section requires in order to "distinctly state the tax". The notes of decisions under the section, 2 Iowa Code Annotated, pages 263–268, list the cases which refer in any way to section 7. In a number of them the holding is simply that the section has no application. None of them help much in this case. In Grout v. Kendall, supra, 195 Iowa 467, 192 N.W. 529, the printed record shows that section 11 of the Soldiers' Bonus Law there involved was in substance like section 12 in the present bonus law, except that it imposed a direct annual tax "sufficient to produce * * * $1,100,000 each year for twenty years for the payment of principal of said bonds and sufficient in amount to produce such additional sums as may be needed to pay the interest on such bonds." The total debt authorized in that law was $22,000,000 and one twentieth of the principal sum was to be paid yearly for twenty years. In the Act before us $1,750,000 or one twentieth of $35,000,000, the principal of the debt, is to be paid yearly for twenty years. Neither bill states the exact total of principal and interest payable annually nor the exact tax to be collected each year, to pay the sum. Neither law states the millage rate.

The proposition relied on by plaintiff in this division was not raised or discussed in the Grout case but the law was upheld. In State ex rel. Fletcher v. Executive Council, 207 Iowa 923, 223 N.W. 737, which passed upon the validity of the $100,000,000 Road Bond Act (chapter 2, Extra Session, Acts of Forty-second General Assembly), the objection was raised that the Act violated section 7 of Article VII in that it did not distinctly state the tax. In that Act a direct annual tax was imposed but it was to be levied and collected only in the event that money appropriated from the primary road fund was insufficient to pay the principal and interest annually due on the bonds. The primary road fund was maintained from the gasoline tax, motor vehicle licenses, and federal contributions, and the law provided that the tax and the

licenses could not be lessened or abrogated during the life of the debt. The court held that the Forty-second General Assembly could not thus bind the hands of any future General Assembly, and thus prevent it from doing as it saw fit with gasoline taxes and license fees, and to nullify their use in paying the road bonds. The irrevocable section of the road bond law was therefore held invalid. This prevented the substitution of money from the primary road fund for the "direct tax" required by section 5 of Article VII.

Justice Evans wrote the opinion in the Grout case and also in the Road Bond case. The court held the law unconstitutional for a number of reasons. With respect to section 7 of Article VII, the opinion, on pages 932, 933, of 207 Iowa, page 741 of 223 N.W., states:

"The foregoing [section 12 of the Act] purports to be responsive to the requirement of the Constitution for the levy of a 'direct tax.' This section is challenged by the plaintiff in that it fails to 'impose' a tax, and fails to 'distinctly state the tax,' all as required by Article VII. It is first to be noted that this section does not provide the millage of taxation. It is contended for the defendants that the millage rate is a mere matter of computation; that all the factors are made to appear in the legislation, from which the computation can be made; that such computation is purely clerical or administrative. If it be correct that all the factors of the computation are disclosed, then it is doubtless true that the matter of computation is quite clerical. In Grout v. Kendall, 195 Iowa 467 (page 475), a bond issue for the payment of a soldiers' bonus was involved. The enactment of the legislature was submitted to a vote of the electorate, as here. That provision of the enactment which purported to impose a direct tax, as required by Article VII, omitted the specification of any millage rate. We held it to be a sufficient compliance with the requirements of the Constitution, although that particular omission was not pressed upon our attention. We pass, therefore, to the consideration of the question whether the correct factors of the computation are present."

The opinion then states that the invalidation of sections 12,

13 and 15 of the Act destroyed them as correct factors, "and therefore the clerical character of the computation for the rate of millage fails."

The plain implication of the court's language in the opinion in the Road Bond case is that if the factors are present from which the clerical computation of the millage tax can be made, the tax is distinctly stated. In the case on appeal the only provision for the payment of the bonds is by an annual direct tax. No part of the debt is to be paid by funds from any other source. The tax imposed, levied and collected is stated in the Act to be a direct annual tax upon all taxable property. There is nothing uncertain or indistinct so far. The valuation of all taxable property is ascertainable from the records in the possession of the state tax commission. The state treasurer, from the records in his office, can readily determine the amounts of principal and interest due each year from the record of the bond sales and the bonds still outstanding. The interest rate is stated in the bonds. He can determine annually whether any funds derived from previous years' taxes for the payment of interest and the retirement of principal still remain in his hands. From these factors he can accurately certify to the tax commission in dollars and cents the amount needed to be raised by the direct annual tax. The tax commission need only then make a simple mathematical computation, that is, divide the amount in dollars and cents needed to be raised by the total valuation of all taxable property within the state, and the answer or quotient will be the millage or rate percentum of tax which they in turn must certify to the respective county auditors to be levied and assessed on the valuation of the taxable property in each county. Certainly, the acts and computations of both the state treasurer and the tax commission in performing these duties are clerical or administrative in every respect. The procedure is identical with that used in making the annual levies under sections 444.22 and 444.23 of the 1946 Code. The state comptroller each year of the biennium certifies to the tax commission the amount of money to be levied for general state taxes. The commission then computes the rate in percentage by dividing the amount necessary to be raised by the assessed

valuation of the taxable property, and certifies the rate to each county auditor.

We find no violation of section 7 of Article VII of the Constitution.

X. Plaintiff in his ninth proposition urged that the treasurer's supplemental department order conflicts with chapter 59 in that it contemplates that the bonds will be sold in groups. This order is in compliance with the provisions of Senate File 222. It was for the legislature to determine the policy and plan of the sale of the bonds. There is no constitutional prohibition against the plan, and it is not within the province or power of the court to pass upon the wisdom or propriety of such plan or policy. But it appears to the court that if the bonds are sold in groups and only as reasonably needed it will effect a substantial saving in interest.

We have given full consideration to every contention and proposition urged by plaintiff: Able presentations have been made on each side. It is our firm conclusion that the motion to dismiss plaintiff's petition was properly sustained.

The judgment below is affirmed.—Affirmed.

All JUSTICES concur except MANTZ, J., not sitting.