Filed 11/30/21

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| JOHN TOS et al., | C089466 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2016-00204740-CU-WM-GDS) |
| v. | |
| STATE OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Richard Sueyoshi, Judge.  Affirmed.

Law offices of Stuart M. Flashman, Stuart M. Flashman; and Michael J. Brady for Plaintiffs and Appellants.

Xavier Becerra and Rob Bonta, Attorneys General, Thomas S. Patterson, Assistant Attorney General, Paul Stein and Sharon L. O'Grady, Deputy Attorneys General, for Defendants and Respondents.

Appellants John Tos et al. (Tos parties) appeal from a judgment that section

2704.78 of the Safe, Reliable High-Speed Train Bond Act for the 21st Century (Bond

Act) (Sts. & Hy. Code, § 2704 et seq.) does not violate the state debt provision of the California Constitution set forth in article XVI, section 1.[1]

Subdivision (d) of section 2704.08 of the Bond Act, approved by the voters in 2008 as Proposition 1A, requires an independent financial report indicating, among other things, that each corridor or segment of a corridor of the high-speed train system, if completed according to a "detailed funding plan" (§ 2704.08, subd. (d)(1)), would be "suitable and ready for high-speed train operation."[2]  (§ 2704.08, subd. (d)(2)(B).) Section 2704.78, subdivision (a), passed by the Legislature in 2016 but not submitted to the voters, provides that "[f]or purposes of the funding plan required pursuant to subdivision (d) of Section 2704.08, a corridor or usable segment thereof is 'suitable and ready for high-speed train operation' if the bond proceeds . . . are to be used for a capital cost for a project that would enable high-speed trains to operate immediately or after additional planned investments are made on the corridor or useable segment thereof and passenger train service providers will benefit from the project in the near-term."

---

[1]  All undesignated statutory references are to the Streets and Highways Code.

[2]  The Bond Act does not define this phrase, but does define the following terms:

"(d) 'High-speed train' means a passenger train capable of sustained revenue operating speeds of at least 200 miles per hour where conditions permit those speeds.

"(e) 'High-speed train system' means a system with high-speed trains and includes, but is not limited to, the following components:  right-of-way, track, power system, rolling stock, stations, and associated facilities.

"(f) 'Corridor' means a portion of the high-speed train system as described in Section 2704.04.  [For example, the "corridor" between San Francisco and Los Angeles. (§ 2704.04, subd. (b)(2).)]

"(g) 'Usable segment' means a portion of a corridor that includes at least two stations."  (§ 2704.01.)

Article XVI, section 1 of the California Constitution requires state debt over $300,000 to be authorized by a law approved by two-thirds of the Legislature and a majority of the voters. This provision also requires that state debt be "for some single object or work to be distinctly specified therein" and the proceeds "applied only to the specific object" of the authorizing law. (Cal. Const., art XVI, § 1.) The law is "irrepealable until the principal and interest thereon shall be paid and discharged . . . ." (*Ibid.*) The Tos parties contend the meaning of "suitable and ready for high-speed train operation" set forth in section 2704.78, subdivision (a), constituted an implied partial repeal of the Bond Act in violation of section 1 of article XVI of the California Constitution.

We disagree. This constitutional provision does not prohibit alterations of a bond law approved by the voters for a complex public works project, like the high-speed train system, which do not divert funds from, interfere with, or destroy the "single object or work . . . distinctly specified" (Cal. Const., art. XVI, § 1) in the law. Section 2704.78 did not do so. The "single object or work" of the Bond Act was (1) the initial planning and construction of a high-speed train system under (2) a "mandatory multistep process to ensure the financial viability of the project," which we described in *California High-Speed Rail Authority v. Superior Court* (2014) 228 Cal.App.4th 676 (*Rail Authority*), our prior opinion on the Bond Act, as a "financial straitjacket." (*Rail Authority*, at p. 706.) Section 2704.78 furthered the construction of the high-speed train system by investing in improvement of existing rail lines, which after additional investment would be shared with high-speed rail under the "blended systems" approach, while providing benefits to passengers in the near term. Nor did section 2704.78 constitute an escape from the "financial straitjacket." The multistep planning and review process in section 2704.08, subdivision (d), remained intact.

The judgment will be affirmed.

3

## FACTUAL AND PROCEDURAL BACKGROUND

We need not repeat the description of the Bond Act, its history, overall structure and initial implementation, which we set forth in *Rail Authority, supra*, 228 Cal.App.4th at pages 684-693.  Lead petitioner in this case, John Tos, was also the lead petitioner in *Rail Authority* and the parties are well familiar with the background of the Bond Act and our opinion in *Rail Authority*.

This case concerns subdivision (d)(2) of section 2704.08, the final step in the series of plans and reports required by section 2704.08 to appropriate and expend bond proceeds for the capital costs of a high-speed train corridor or usable segment thereof.

The first step, subdivision (c) of section 2704.08, requires the California High-Speed Rail Authority (Authority), prior to a request to appropriate bond proceeds, to submit a "detailed funding plan" to the Legislature and Governor.  (§ 2704.08, subd. (c)(1).)  This report must have been previously submitted to the Director of Finance, a peer review group, and multiple legislative committees.  (*Ibid.*)  Section 2704.08, subdivision (c)(2), specifies the 11 subjects that the plan must "include, identify, or certify," beginning with "[t]he corridor, or usable segment thereof, in which the authority is proposing to invest bond proceeds," and ending with "[t]he authority has completed all necessary project level environmental clearances necessary to proceed to construction." (§ 2704.08, subd. (c)(2)(A), (K).)  One of the 11 specified subjects is that "[t]he corridor or usable segment thereof would be suitable and ready for high-speed train operation." (§ 2704.08, subd. (c)(2)(H).)

The second step, subdivision (d)(1) of section 2704.08, requires the Authority, prior to expenditure of bond proceeds for a corridor or usable segment, to submit a "detailed funding plan" to the Director of Finance and Joint Legislative Budget Committee.  (*Rail Authority, supra*, 228 Cal.App.4th at p. 688.)  Subdivision (d)(1) specifies six subjects to be included in the plan beginning with "identif[ying] the corridor or usable segment thereof, and the estimated full cost of constructing the corridor or

4

usable segment thereof" and ending with "terms and conditions associated with any agreement proposed to be entered into by the authority and any other party for the construction or operation of passenger train service along the corridor or usable segment thereof." (§ 2704.08, subd. (d)(1)(A), (F).)

The third and final step, subdivision (d)(2) of section 2704.08, requires the Authority also to submit to the Director of Finance and Joint Legislative Budget Committee "a report or reports, prepared by one or more financial services firms, financial consulting firms, or other consultants, independent of any parties, other than the authority, involved in funding or constructing the high-speed train system . . . ." The report or reports must "indicat[e]" five subjects, the first two of which concern us here: "(A) construction of the corridor or usable segment thereof can be completed as proposed in the plan submitted pursuant to paragraph (1), [and] (B) if so completed, the corridor or usable segment thereof would be suitable and ready for high-speed train operation." (§ 2704.08, subd. (d)(2)(A), (B).)

The meaning of "suitable and ready for high-speed train operation" set forth in section 2704.78 can be traced to the "Revised 2012 Business Plan" (revised business plan) adopted by the Authority in mid-April 2012. As noted in *Rail Authority*, the Authority is required to " 'prepare, publish, adopt, and submit to the Legislature, not later than January 1, 2012, and every two years after, a business plan.' " (*Rail Authority, supra*, 228 Cal.App.4th at p. 689, citing Pub. Util. Code, § 185033, former subd. (a), as amended by Stats. 2009, ch. 618, § 1.) The Authority certified the preliminary funding plan required by section 2704.08, subdivision (c), two days after issuing a "Draft 2012 Business Plan" in 2011. (*Rail Authority*, at p. 690.)

After a peer review group to the Legislature outlined weaknesses in the preliminary funding plan and draft business plan (*Rail Authority, supra*, 228 Cal.App.4th at p. 690), the Authority adopted the revised business plan in mid-April 2012. (*Id.* at p. 691.) Among other things, "the revised business plan introduced a 'blended systems'

5

approach that integrates high-speed rail with existing commuter lines in various urban areas. The revised business plan states: 'Passengers will have more options, faster travel times, and greater reliability and safety. . . . [¶] Benefits will be delivered *faster* through the adoption of the blended approach and through investments in the bookends. Across the state, transportation systems will be improved and jobs will be created through the implementation of those improvements.' " (*Id.* at p. 691.)[3]

In 2016, the Legislature passed Assembly Bill No. 1889 (2015-2016 Reg. Sess.), enacting section 2704.78, effective January 1, 2017. (Stats. 2016, ch. 744, § 2.) Section 1 of the statute explained that the impetus for section 2704.78 was the blended systems approach introduced in the revised business plan:

"(c) In 2012, the High-Speed Rail Authority released the Revised 2012 Business Plan, which called for near-term investments in northern and southern California, known

---

[3] We deferred ruling on respondent's request for judicial notice of a 2012 letter opinion from Legislative Counsel asking whether the revised business plan complied with Proposition 1A. The trial court denied the request without explanation. We grant it. The Legislative Counsel opined that a 130-mile segment with some but not all of the features needed for high-speed rail operation met the requirement of "suitable and ready for high-speed train operation." The Legislative Counsel reasoned: "Because, in our view, the bond act authorizes interim use of a facility constructed with bond act funds by conventional diesel-operated passenger train service, imposing a requirement to construct the usable segment with features that may not be needed for a number of years, such as electrification, could be determined to be an unreasonable result. Moreover, because it could be many years before these features could be put to use, including them immediately could lead to degradation of the electric catenary lines and related facilities and result in a waste of government funds." (Ops. Cal. Legis. Counsel, No. 1211030 (June 8, 2012) High-Speed Rail, p. 15.) However, "a *post hoc* expression of the Legislative Counsel's opinion of what the Legislature meant when it adopted [the statute] . . . is only as persuasive as its reasoning." (*Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 922; *Mundy v. Superior Court* (1995) 31 Cal.App.4th 1396, 1404.) In this case, it is the voters' intent that we seek to effectuate. (*Santos v. Brown* (2015) 238 Cal.App.4th 398, 409.) Moreover, notwithstanding the Legislative Counsel's opinion, the Legislature subsequently enacted section 2704.78 to explicitly provide an expanded definition of "suitable and ready for high-speed train operation."

6

as the 'Bookends,' which would enable high-speed trains to share infrastructure with existing passenger rail service providers as part of a blended system, and is consistent with Proposition 1A.  [¶] . . . [¶]

"(g)  It is the intent of the Legislature, in appropriating funding for initial investments, that these projects should proceed to construction in the near-term to provide economic benefits, create jobs, and advance improved, safer, and cleaner rail transportation and that these initial investments are consistent with and further the goals of Proposition 1A.

"(h)  Consistent with Proposition 1A, these early investments will enable passenger train service providers to begin using the improvements on a corridor or useable segment thereof while additional work is completed to enable high-speed train service.

"(i)  Furthermore, it is the intent of the Legislature that nothing in this act relieves the High-Speed Rail Authority from its duties under Proposition 1A, including the submission to the Director of Finance of the plan required pursuant to subdivision (d) of Section 2704.08 of the Streets and Highways Code.

"(j)  As established in Proposition 1A, the required plan shall be informed by the work of one or more independent financial services firms, financial consulting firms, or other consultants, pursuant to paragraph (2) of subdivision (d) of Section 2704.08 of the Streets and Highways Code.

"(k)  This act clarifies that early investments in the Bookends and elsewhere along the system . . . which will ultimately be used by high-speed rail trains, are consistent with the intent of the Legislature in appropriating funding and is consistent with Proposition 1A." (Stats. 2016, ch. 744, § 1.)

Section 2704.78 provides in relevant part:  "(a) For purposes of the funding plan required pursuant to subdivision (d) of Section 2704.08, a corridor or usable segment thereof is 'suitable and ready for high-speed train operation' if the bond proceeds . . . are

7

to be used for a capital cost for a project that would enable high-speed trains to operate immediately or after additional planned investments are made on the corridor or useable segment thereof and passenger train service providers will benefit from the project in the near-term.

"(b) In each report prepared pursuant to Sections 185033 and 185033.5 of the Public Utilities Code, the authority shall include information describing the use of bond proceeds appropriated . . . demonstrating that the investments made are consistent with the authority's current business plan and advance the development of the Phase I blended system as described in the business plan." (§ 2704.78.)

On December 13, 2016, the Tos parties filed a complaint for declaratory and injunctive relief challenging, inter alia, the constitutionality of Assembly Bill No. 1889 and thus section 2704.78. After a series of demurrers and amended complaints, on July 16, 2018, the Tos parties filed a motion for judgment on the pleadings on the cause of action in their second amended complaint for a declaration that Assembly Bill No. 1889 is unconstitutional and invalid.

The trial court denied the motion, finding that "[Assembly Bill No.] 1889 did not impliedly repeal Proposition 1A by making 'substantial changes in the scheme or design which induced voter approval.' (*Veterans of Foreign Wars v. State of California* (1974) 36 Cal.App.3d 688, 693-694.)" Deeming this result dispositive of all their claims, the Tos parties and respondents State of California et al. stipulated to entry of judgment pursuant to *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 402, to seek review from this court on the constitutional validity of Assembly Bill No. 1889 and section 2704.78.[4]

---

[4] The parties agree they entered into the stipulated judgment because all of the Tos parties' claims depended on a determination that Assembly Bill No. 1889 is unconstitutional. The stipulated judgment is thus appealable under the exception in *Norgart* to the general rule that consent judgments are not appealable except where " 'consent was merely given to facilitate an appeal following adverse determination of a

8

## DISCUSSION

### *Standard of Review*

The Tos parties' constitutional challenges are to section 2704.78 as written. "In such a case we do not defer to the superior court's ruling; we independently interpret the law to determine whether or not it is constitutional." (*Griffith v. City of Santa Cruz* (2012) 207 Cal.App.4th 982, 990, citing *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 89-90; *Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433 ["Constitutional issues are always reviewed de novo"]; see also *California Advocates for Nursing Home Reform v. Smith* (2019) 38 Cal.App.5th 838, 864; *People v. Health Laboratories of North America, Inc.* (2001) 87 Cal.App.4th 442, 445 ["The interpretation of a statute and the determination of its constitutionality are questions of law"]; *B.M. v. Superior Court* (2019) 40 Cal.App.5th 742, 748 (*B.M.*).)

" 'In considering a facial challenge to a statute, we uphold the statute unless its unconstitutionality plainly and unmistakably appears; all presumptions favor its validity.' " (*Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584, 1595-1596, citing *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 10-11; *Pryor v. Municipal Court* (1979) 25 Cal.3d 238, 253-255.) Statutes are presumed to be constitutional and " 'will be given a construction consistent with validity if at all possible.' " (*Persky v. Bushey* (2018) 21 Cal.App.5th 810, 818.) " ' "Invalidating legislation is serious business," ' and we cannot construe a statute 'contrary to legislative intent merely to eliminate a potential constitutional conflict.' " (*Ibid.*) "A challenge to the facial constitutionality of a statute cannot be sustained unless the statutory terms 'inevitably pose a present total and fatal conflict with applicable

---

critical issue.' " (*Norgart v. Upjohn Co., supra*, 21 Cal.4th at p. 400; *Wilshire Ins. Co. v. Tuff Boy Holding, Inc.* (2001) 86 Cal.App.4th 627, 634, fn. 6 ["The stipulated judgment, made to hasten appeal rather than settle the dispute, is appealable"].)

9

constitutional prohibitions.' " (*Ibid.*, citing *Pacific Legal Foundation v. Brown* (1981) 29 Cal.3d 168, 181.)

"We also bear in mind the well-established separation of powers principle that '[c]ourts should exercise judicial restraint in passing upon the acts of coordinate branches of government; the presumption is in favor of constitutionality, and the validity of the legislation must be clear before it can be declared unconstitutional.' [Citation.] Legislative findings are entitled to ' "great weight" ' and ' "will be upheld unless they are found to be unreasonable and arbitrary." ' " (*B.M., supra*, 40 Cal.App.5th at pp. 748-749; *Amwest Surety Ins. Co. v. Wilson* (1995) 11 Cal.4th 1243, 1252 (*Amwest*).)

Our inquiry also involves interpretation of section 2704.08, subdivision (d), passed by initiative. "Statutes adopted by the voters must be construed liberally in favor of the people's right to exercise their reserved powers, and it is the duty of the courts to jealously guard the right of the people by resolving doubts in favor of the use of those reserved powers." (*Rail Authority, supra*, 228 Cal.App.4th at p. 708.) "The voters as well as the bondholders have an interest in the continued integrity of voter-ratified bond proposals." (*Ibid.*) "Yet the same basic rules of statutory construction apply to statutes enacted by the voters as to statutes passed by the Legislature. [Citation.] We must look to the plain language of the statute to determine the intent of the electors [citation]; but the words of the statute are given their ordinary meaning in the context of the statute as a whole and in light of the entire statutory scheme." (*Ibid.*) To determine the intent of an initiative statute, "we may also look to the ballot materials in support of its passage." (*B.M., supra*, 40 Cal.App.5th at p. 753; *Amwest, supra*, 11 Cal.4th at p. 1256; *People v. Superior Court* (*K.L.*) (2019) 36 Cal.App.5th 529, 535.)

Finally, since the Tos parties' assertion that section 2704.78 is unconstitutional rests on article XVI, section 1 of the California Constitution, "[w]e must examine the text of that constitutional provision, applying the same general principles as those on which statutory construction is based." (*Persky v. Bushey, supra*, 21 Cal.App.5th at p. 818.)

10

" 'The aim of constitutional interpretation is to determine and effectuate the intent of those who enacted the constitutional provision at issue.  [Citation.]  To determine that intent, we begin by examining the constitutional text, giving the words their ordinary meanings.' "  (*Ibid.*)  " ' "If the language is clear, there is no need for construction.  [Citation.]  If the language is ambiguous, however, we consider extrinsic evidence of the enacting body's intent." ' "  (*Greene v. Marin County Flood Control & Water Conservation Dist.* (2010) 49 Cal.4th 277, 290, quoting *Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037.)

*Constitutionality of Section 2704.78*

The Tos parties contend that cases interpreting and applying article XVI, section 1 of the California Constitution "make clear that once the voters have been presented with and approved such a bond measure; the Legislature may not make 'substantial changes in the scheme or design which induced voter approval.' "[5]  As we will discuss further, the

---

[5]  Article XVI, section 1 of the California Constitution provides in relevant part:  "The Legislature shall not, in any manner create any debt or debts, liability or liabilities, which shall, singly or in the aggregate with any previous debts or liabilities, exceed the sum of three hundred thousand dollars ($300,000), except in case of war to repel invasion or suppress insurrection, unless the same shall be authorized by law for some single object or work to be distinctly specified therein which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability within 50 years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged, and such law may make provision for a sinking fund to pay the principal of such debt or liability to commence at a time after the incurring of such debt or liability of not more than a period of one-fourth of the time of maturity of such debt or liability; but no such law shall take effect unless it has been passed by a two-thirds vote of all the members elected to each house of the Legislature and until, at a general election or at a direct primary, it shall have been submitted to the people and shall have received a majority of all the votes cast for and against it at such election; and all moneys raised by authority of such law shall be applied only to the specific object therein stated or to the payment of the debt thereby created.  Full publicity as to matters to be voted upon by the people is afforded by the setting out of the complete text of the proposed laws, together with the arguments for and against them, in the ballot

11

Tos parties quote a passage from *Veterans of Foreign Wars v. State of California, supra*, 36 Cal.App.3d 688 (*Veterans*), in which the appellate court concluded that the Legislature violated article XVI, section 1 when it appropriated funds for the expenses of maintaining county veterans' service offices from the proceeds of bonds approved by voters to finance farm and home acquisition for veterans. (*Veterans*, at p. 695.)

The Tos parties also cite in support of this proposition our opinion in *Rail Authority*, where we said: "It is true that a bond act approved by the voters can, by its terms, limit the purposes for which the bond proceeds can be spent. (*O'Farrell v. County of Sonoma* (1922) 189 Cal. 343, 348-349 (*O'Farrell*).) 'Whether the limitation be deemed to be contractual [citation] or of a status analogous to such relation [citation] or a restriction implied by the requirement of popular approval of the bonds [citation], it does restrict the power of the public body in the expenditure of the bond issue proceeds, and hence in the nature of the project to be completed and paid for.' (*Mills v. S.F. Bay Area Rapid Transit Dist.* (1968) 261 Cal.App.2d 666, 668 (*Mills*).) More importantly, article XVI, section 1 of the California Constitution requires that the works funded by a bond measure shall be 'distinctly specified' in the measure presented to the voters, and that any bonds to be issued as authorized by the bond act approved by the voters 'shall be applied only to the specific object therein stated.' " (*Rail Authority, supra*, 228 Cal.App.4th at p. 701.)

Thus, we focus on whether the expanded meaning of "suitable and ready for high-speed train operation" in section 2704.78 violates the requirement in article XVI, section

---

pamphlet mailed to each elector preceding the election at which they are submitted, and the only requirement for publication of such law shall be that it be set out at length in ballot pamphlets which the Secretary of State shall cause to be printed. The Legislature may, at any time after the approval of such law by the people, reduce the amount of the indebtedness authorized by the law to an amount not less than the amount contracted at the time of the reduction, or it may repeal the law if no debt shall have been contracted in pursuance thereof." (Cal. Const, art. XVI, § 1.)

1 of the California Constitution that the works funded be "distinctly specified" in the bond measure and funds be applied to that "specific object." Respondents argue that "specific object" of the Bond Act is set forth broadly in section 2704.04, subdivision (a), "to initiate the construction of a high-speed train system . . . ." In addition, section 2704.04, subdivision (d), sets forth one specific prohibition on the use of bond funds: "Proceeds of bonds authorized pursuant to this chapter shall not be used for any operating or maintenance costs of trains or facilities." In sum, under section 2704.04, the "specific object" of the Bond Act is to fund initial construction of a high-speed train system but not pay the cost of operating or maintaining trains or facilities. To the extent that section 2704.78 is consistent with this "specific object," the statute does not violate article XVI, section 1 of the California Constitution.

*Metropolitan Water Dist. v. Marquardt* (1963) 59 Cal.2d 159 (*Marquardt*) supports the interpretation of "specific object" as a broad plan that embraces matters reasonably germane to the plan. In *Marquardt*, a bond act added sections to the Water Code " 'relating to provision for the development of water resources of the State' " by providing funds through the sale of bonds. (*Id.* at p. 171.) The Water Code section added by the bond act enumerated various facilities to be funded, including the Feather River dam and reservoir, an aqueduct system to deliver water to various parts of the state, various facilities to conserve and transfer water in the Sacramento-San Joaquin Delta, facilities for removing drainage water from the San Joaquin Valley, facilities for the generation and transmission of electrical energy, water development facilities in local areas, and other facilities deemed necessary to supply water in the Delta. (*Id.* at pp. 171-172.)

The primary challenge to this bond act was that it violated section 24 of article IV of the California Constitution that "every act shall embrace but one subject and that subject shall be expressed in the title." (*Marquardt, supra*, 59 Cal.2d at p. 171.) The court held that section 24 of article IV "must be construed liberally so as to uphold

13

legislation all parts of which are reasonably germane, and a provision which is auxiliary to and promotive of the main purpose of the act or has a necessary and natural connection with that purpose is germane within this rule." (*Marquardt*, at pp. 172-173.) "[T]he general purpose of a statute being declared, the details provided for its accomplishment will be regarded as necessary incidents." (*Id.* at p. 173, citing *Perry v. Jordan* (1949) 34 Cal.2d 87, 92-93.)

The court also considered whether the act authorizing $1.75 billion in bonds violated section 1 of article XVI of the California Constitution. The court held that it did not, analogizing the question whether the bond act was for a " 'single object or work' " as these words are used in section 1 of article XVI to the question whether the bond act embraces one " 'subject' " under section 24 of article IV. (*Marquardt, supra*, 59 Cal.2d at p. 175.) The court held "the matters embraced by the bond act are germane to one plan, and the obligations created are for a 'single object.' " (*Ibid.*) "Under these circumstances it is apparent that specification of a plan in broad and general terms will be sufficient to meet the requirement of section 1 of article XVI that the object be 'distinctly specified' in the act . . . ." (*Id.* at p. 175.)

Under the reasoning in *Marquardt*, the broad and general statement that the purpose of the Bond Act is to initiate construction but not operation of a high-speed train system is the "single object or work distinctly specified" against which the question whether section 2704.78 violates section 1 of article XVI is measured. Plainly, section 2704.78 does not. As the Legislative findings for section 2704.78 indicate, the statute was enacted in furtherance of the blended system approach introduced in 2012 in the revised business plan. (Stats. 2016, ch. 744, § 1, subd. (c); *Rail Authority, supra*, 228 Cal.App.4th at p. 691.) Under the blended systems approach, the high-speed train system shares corridors and segments with existing commuter train systems. Such corridors and segments are improved in preparation for high-speed rail, while at the same time providing immediate benefits to the passengers currently using them. The blended

14

systems approach is "germane" to the "specific object" of the Bond Act, i.e., the plan for initial construction of a high-speed train system. By the same token, section 2704.78 is germane to the plan of the Bond Act.

The Tos parties maintain that "suitable and ready for high-speed train operation" can only mean (1) that the segment must be "suitable" for high-speed train operation with the "track structure, slope limits, curvature limits, power supply, signaling equipment, etc. appropriate to allow a high-speed train to operate safely and reliably," and (2) "ready" such that "even if the *design* of the system were suitable for high-speed train operation, if some part of the design had not yet been implemented—e.g., the signaling system had not been installed or properly tested and certified, the segment would still not be prepared or available, and hence not ready for high-speed train operation." In short, according to the Tos parties, this phrase mandates complete construction of, and only of, a corridor or segment upon which a high-speed train could immediately travel at speeds up to 200 miles (at least for the length of that corridor or segment).[6]

Even adopting the Tos parties' interpretation of the phrase "suitable and ready for high-speed train operation," which is undefined in the Bond Act, as not extending to the

---

[6] We granted the Tos parties' request for judicial notice of the text of bills, legislative committee reports, and the Governor's Budget, May Revision 2008-09 relating to the Bond Act, all of which were judicially noticed by the trial court. Our review of these materials indicates that the funding plans required by section 2704.08, subdivisions (c) and (d), were a significant feature of Assembly Bill No. 1889. The Tos parties point to the statement in the Governor's budget revision that "there must be a complete funding plan that provides assurance that all funding needed to provide service on that portion of the system is secured" as support for restricting all bond funds to construction of immediately operational high-speed rail. However, the Governor's budget revision also called for amendments to the bond bill to "ensure an appropriate balance between assuring expenditures of the bond funds will result in operational high-speed rail services and providing the flexibility needed to attract federal and local government, as well as private sector, participation in funding, constructing, and operating the system." The "blended system" approach and section 2704.78 strike that balance.

15

expanded meaning in section 2704.78, we noted in *Rail Authority*, that there are "many cases in which the courts have broadly construed the purpose of the relevant bond acts to allow projects to proceed that would appear to be either at odds with, or beyond the scope of, the articulated purpose of the act or the description of the project on the ballot." (*Rail Authority, supra*, 228 Cal.App.4th at pp. 701-702.) We cited as an example *East Bay Mun. Util. Dist. v. Sindelar* (1971) 16 Cal.App.3d 910 (*East Bay*), where the voters authorized bonds to fund a 10-year water development project in the East Bay in 1958 and the court issued a peremptory writ of mandate to compel the treasurer to issue additional bonds in 1970 to finance the project. (*Rail Authority*, at p. 702.) Even though "the construction of the water system was complete and the language of the promotional materials for the ballot measure represented that the construction program would end within 10 years and no additional bonds would be issued or sold, the court found the bond proposition had been submitted to the voters 'in broad and general terms.' " (*Ibid*.)

Here, the Official Voter Information Guide for Proposition 1A similarly described the bond issue broadly. The guide stated in the official title and summary portion that the Bond Act "[p]rovides for a bond issue of $9.95 billion to establish high-speed train service linking Southern California counties, the Sacramento/San Joaquin Valley, and the San Francisco Bay Area." (Voter Information Guide, Gen. Elec. (Nov. 4, 2008) Official Title and Summary of Prop. 1A, p. 4 (Voter Information Guide).) The guide also contained analysis by the Legislative Analyst that "[t]his measure authorizes the state to sell $9.95 billion in general obligation bonds to fund (1) pre-construction activities and construction of a high-speed passenger train system in California, and (2) capital improvements to passenger rail systems that expand capacity, improve safety, or enable train riders to connect to the high-speed train system." (Voter Information Guide, *supra*, Analysis of Prop. 1A by the Legis. Analyst, p. 5.)

Analysis by the Legislative Counsel of the funding process is also relatively broad: "The measure requires accountability and oversight of the authority's use of bond funds

16

authorized by this measure for a high-speed train system. Specifically, the bond funds must be appropriated by the Legislature, and the State Auditor must periodically audit the use of bond funds. In addition, the authority generally must submit to the Department of Finance and the Legislature a detailed funding plan for each corridor or segment of a corridor, before bond funds would be appropriated for that corridor or segment. The funding plans must also be reviewed by a committee whose members include financial experts and high-speed train experts. An updated funding plan is required to be submitted and approved by the Director of Finance before the authority can spend the bond funds, once appropriated." (Voter Information Guide, *supra*, Analysis of Prop. 1A by the Legis. Analyst, p. 5.)

This analysis does not enumerate or refer to the subjects specified in section 2704.08, subdivision (c) and (d), let alone mention or allude to the phrase "suitable and ready for high-speed train operation" on which the Tos parties rely. We noted in *Rail Authority* that *East Bay* quoted "the rationale" of *Clark v. Los Angeles* (1911) 160 Cal. 317, 320, that " ' "[t]he purpose for which . . . [bond] . . . elections are required is to obtain the assent of the voters to a public debt, to the amount, and the object proposed. The amount must, of course, be stated on the ballot; the general purpose must be stated with sufficient certainty to inform the voters and not mislead them, as to the object intended; but the details of the proposed work or improvement need not be given at length in the ballot." ' " (*Rail Authority, supra*, 228 Cal.App.4th at pp. 702-703; *East Bay, supra*, 16 Cal.App.3d at p. 919.)

However, the Tos parties point out that the Legislative Analyst states in the guide that $9 billion is allocated to develop the high-speed train system and the remaining $950 million to improve the capacity or safety of other passenger rail systems or allow passengers to connect to the high-speed train system. (Voter Information Guide, *supra*, Analysis of Prop. 1A by the Legis. Analyst, p. 5; see also §§ 2704.04, subd. (b) [$9 billion in net bond proceeds for planning, engineering and capital costs of high-speed

17

train system], 2704.095 [$950 million in net bond proceeds for intercity, commuter and urban rail lines that connect to high-speed train system, are part of the high-speed train system, or provide capacity enhancements and safety improvements].)  It may be argued the blended system approach adopted in the revised business plan and reflected in section 2704.78, subdivision (a), changes that allocation to allow expenditure of all $9.95 billion in bond proceeds on the projects set forth in both sections 2704.04, subdivision (b), and 2704.095.

On that score, we explained in *Rail Authority*:  "The courts have been particularly attuned to the fluidity of the planning process for large public works projects.  In fact, the Supreme Court has allowed substantial deviation between the preliminary plans submitted to the voters and the eventual final project, admonishing:  '[T]he authority to issue bonds is not so bound up with the preliminary plans as to sources of supply upon which the estimate is based that the proceeds of a valid issue of bonds cannot be used to carry out a modified plan if the change is deemed advantageous.' (*Cullen v. Glendora Water Co.* (1896) 113 Cal. 503, 510.)  Similarly, the court broadly construed the purpose of the proposition approving the Bay Area Rapid Transit District and sanctioned the relocation of one of the terminal stations.  The court wrote, 'Obviously, the statutes, the notice of election and the ballot proposition itself contemplate a broad authority for construction of a three-county rapid transit system.  In the wide scope of this substantial transit project, the deviation of 1 1/2 miles in location of a single station is but a minor change in the tentative plan which was relied upon only to forecast feasibility of the project as a whole.' (*Mills*[ *v. S.F. Bay Area Rapid Transit Dist.*]*, supra*, 261 Cal.App.2d at p. 669.)" (*Rail Authority, supra*, 228 Cal.App.4th at p. 703.)

Significantly, we observed, "The development of a high-speed rail system for the State of California is even more complex than a regional water or transportation system." (*Rail Authority, supra*, 228 Cal.App.4th at p. 703; see also Note, *State Water Development:  Legal Aspects of California's Feather River Project* (1960) 12 Stan.

18

L.Rev. 439, 458 ["when the components of a large-scale development project have reasonable economic and engineering interdependence the courts should not strictly apply the single purpose requirement"].)

Further, we find support for the principle that a bond law may be altered without violating the "single object or work" requirement from the history of the California Constitution and construction by the courts of Iowa and New York, the states from which California borrowed this constitutional provision. "As a matter of history it is well known that our Constitution is in many respects copied from that of Iowa. Upon motion of Mr. Gwin, the Constitution of Iowa was adopted by the Constitutional Convention as a basis for ours, for the reason, as stated by him, that it was one of the latest and shortest." (*Bourland v. Hildreth* (1864) 26 Cal. 161, 257 (dis. opn. of Sanderson, C.J.); Browne, Rep. of the Debates in Convention of Cal. on Formation of the State Const. (1850) p. 24 (Debates of Convention).) Mr. Gwin in fact printed a copy of the Iowa Constitution for the members of the convention to use to draft the California Constitution at the Monterey convention in 1849. (Debates of Convention, *supra*, at p. 24.)

The brief debate in the California convention on adopting the state debt provision from the Iowa Constitution concerned what the amount of the debt limitation requiring a vote of the people should be in light of the amount in the Iowa Constitution ($100,000) and a similar provision in the New York Constitution ($1 million), settling on $300,000. (Debates of Convention, *supra*, at pp. 165-166.) The article adopted remains much unchanged from that time to the amended Constitution adopted by the state in in 1879 to the present day, including the requirement that the "single object or work" of the bond measure "be distinctly specified" and the money raised be applied to that "specific object." (Debates of Convention, *supra*, at p. 166; Constitution of the State of California Annotated (1946) p. 1270.)

In *Knorr v. Beardsley* (1949) 240 Iowa 828 [38 N.W.2d 236] (*Knorr*), the plaintiff contended that the Iowa Constitution was violated when an act adopted by the voters

19

authorizing issuance of $85 million in bonds to pay service compensation to World War II veterans was amended to appropriate $50 million from a surplus in the state's general fund and limit the bond authorization to $35 million. (*Knorr, supra*, 38 N.W.2d at pp. 239, 240, 241.) The plaintiff relied, inter alia, on a number of sections of the Iowa Constitution regarding state indebtedness, which contained the " 'single work or object . . . distinctly specified' " and " 'specific object' " nearly identical to the language found in section 1 of article XVI of the California Constitution. (*Knorr*, at p. 242.)

The Iowa court held that the amendment did not change the single object of the bond act. (*Knorr, supra*, 38 N.W.2d at p. 246.) The court observed that the Iowa Constitution drew liberally from and followed closely the New York constitutional provision regarding state debts. (*Knorr*, at p. 246.) Under this provision, the New York Legislature had authorized large indebtedness in the establishment and maintenance of the Erie Canal. (*Ibid*.) When later legislation provided alterations in canal routes, injunctions were sought on the ground that this legislation "was an attempt to amend the earlier statutes which had been approved by the voters, without submitting the amendment to voters." (*Ibid.*) The injunctions were denied in each case. (*Ibid.*)

The *Knorr* court noted that, in the last of these opinions, the New York court explained that the vote to contract indebtedness " 'was not taken for the purpose of specifically and in detail indorsing the plans for the canal, but rather to authorize the contracting of indebtedness in behalf of the State for the single specified work of improving the canals of the State.' " (*Knorr, supra*, 38 N.W.2d at p. 246, italics omitted, quoting *Kibbee v. Lyons* (1922) 195 N.Y.S. 563, 566.) "As the construction of the Barge Canal progressed, and the needs to accomplish its purpose were developed, such changes became necessary. But, regardless of the changes in detail, the 'single work or object' for which the indebtedness of the state was authorized was being carried out and the public moneys borrowed expended thereon. The Legislature, without a vote of the people, had not the power to amend the Barge Canal Act in such manner as to divert these state funds

20

to a work other than the single work or object contemplated when the Barge Canal Act was approved; but it could amend the act and the plans for the canal in any respect which did not so divert the funds or interfere with or destroy that 'single work or object.' " (*Kibbee*, at p. 566.) The New York court held that the legislature had the power to decline to build a particular spur of the Erie Canal that was no longer necessary or useful and "that the abandonment of this part of the work is not a radical or fundamental change from the single work or object for which the moneys of the State were appropriated . . . ." (*Kibbee*, at p. 568; *Knorr*, at p. 247; see also *People ex rel. Jordan v. Wotherspoon* (1916) 157 N.Y.S. 923, 925 ["The change in the route of the canal . . . is not a radical or fundamental one. There was no attempt to divert the moneys to some other work. It applied to the single work or object of building the Barge canal, and simply changed the location from an impractical route to one that the authorities deem to be a more suitable one"].)

The reasoning of the courts in Iowa and New York applies here. As the ballot materials show, the voters approved bonds to initiate construction of a high-speed train system under a multistep financing process requiring a preliminary plan for appropriation of funds and final plan for expenditure of funds. This was the "single object or work" of Proposition 1A. The vote was not taken to endorse every detail of the construction and financial planning process. By 2012, when the revised business plan was adopted, it was determined that the " 'blended systems' approach that integrates high-speed rail with existing commuter lines in various urban areas" would give passengers " 'more options, faster travel times, and greater reliability and safety,' " " '[b]enefits will be delivered *faster*,' " and " '[a]cross the state, transportation systems will be improved and jobs will be created through the implementation of those improvements.' " (*Rail Authority, supra*, 228 Cal.App.4th at p. 691.) The near-term benefits of improving existing rail lines to provide economic benefits, create jobs, and provide safer and cleaner transportation,

21

while additional work is completed on high-speed train service, is consistent with the "single work or object" of Proposition 1A. (Stats. 2016, ch. 744, § 1, subds. (g), (h).)

Significantly, as the Legislature found in enacting section 2704.78, nothing in the statute relieved the Authority of its duty to submit the funding plan required by section 2704.08, subdivision (d), to the Director of Finance or eliminated the requirement that plan be informed by the work of one or more independent financial services firms, financial consulting firms, or other consultants pursuant to subdivision (d)(2) of section 2704.08. (Stats. 2016, ch. 744, § 1, subds. (i), (j).)

We conclude section 2704.78 is consistent with the "single object or work" of the Bond Act approved by the voters as Proposition 1A and thus does not violate section 1 of article XVI of the California Constitution.[7]

*Veterans and O'Farrell*

The Tos parties rely on *Veterans, supra*, 36 Cal.App.3d 688 and *O'Farrell v. County of Sonoma, supra*, 189 Cal. 343 (*O'Farrell*). Both are distinguishable and neither is sufficient to invalidate section 2704.78, enacted in the context of a complex public works project like the high-speed train system.

This court's opinion in *Veterans* involved a bond act approved by the voters to create a fund to aid veterans in the acquisition of and payments for farms and homes. (*Veterans, supra*, 36 Cal.App.3d at p. 693 & fn. 3.) The Legislature began appropriating $500,000 annually from the fund to pay the operating expenses of maintaining county veterans' services offices. (*Id.* at p. 692.) In *Veterans*, we focused on the language in

---

[7] In *Rail Authority*, real party in interest First Free Will Baptist Church contended that the revised business plan including the blended system approach demonstrated "that the high-speed rail system to be built is not the same project approved by the voters." (*Rail Authority, supra*, 228 Cal.App.4th at p. 704, fn. 7.) We rejected this contention as "too soon to determine how the Authority will specifically use the bond proceeds." (*Ibid.*) The Tos parties did not renew that contention in this case.

22

section 1 of article XVI of the California Constitution that a bond law " 'shall be irrepealable until the principal and interest [of the bonds] shall be paid and discharged.' " (*Veterans*, at p. 693.) We concluded "[t]he constitutional injunction against later repeal of the bond law aims to prevent the Legislature from making substantial changes in the scheme or design which induced voter approval." (*Ibid.*) Analogizing to the principle that where a later statute that supersedes or substantially modifies an earlier statute, the former by implication partially repeals the latter, we said, "When part of a fund wholly committed by statute is later appropriated to an alien purpose, the appropriation necessarily causes a partial repeal by implication." (*Id.* at p. 694.) However, we cautioned that " '[Repeals by implication] will occur only where the two acts are so inconsistent that there is no possibility of concurrent operation, or where the later provision gives undebatable evidence of an intent to supersede the earlier . . . .' " (*Ibid.*)

Here, the Bond Act was not a relatively simple proposition as in *Veterans*. Proceeds from the Bond Act funded a large and complex public works project including: construction of tracks, structures, power systems, stations and other related facilities and equipment; acquisition of rolling stock; mitigation of environmental impacts; and relocation of displaced property owners and occupants. (§§ 2704.04, subd. (c), 2704.09.) Like the water system in *Marquardt, supra*, 59 Cal.2d 159 and *Cullen v. Glendora Water Co., supra*, 113 Cal. 503 and the transit system in *Mills v. S.F. Bay Area Rapid Transit Dist., supra*, 261 Cal.App.2d 666, "courts have been particularly attuned to the fluidity of the planning process" in allowing deviations from such bond propositions submitted to the voters. (*Rail Authority, supra*, 228 Cal.App.4th at p. 703.) Indeed, section 2704.04, subdivision (c), acknowledges the need for fluidity in providing for application of bond proceeds to as-yet unidentified "other related capital facilities and equipment" and "such other purposes related to the [enumerated purposes], for the procurement thereof, and for the financing or refinancing thereof, as may be set forth in a statute hereafter enacted."

23

Moreover, the blended systems approach introduced in the revised business plan in 2012 and reflected in section 2704.78 is not " 'so inconsistent that there is no possibility of concurrent operation' " with the Bond Act generally or 2704.08, subdivision (d), in particular. (*Veterans, supra*, 36 Cal.App.3d at p. 694.) Section 2704.78 furthered the initial construction of the high-speed rail system by funding investments in improvement of existing train systems that would be shared with the high-speed train system, while additional work is completed to enable high-speed train service. (Stats. 2016, ch. 744, § 1, subds. (g), (h).) Moreover, the expanded "suitable and ready for high-speed train operation" condition, as defined in section 2704.78, subdivision (a), continued to be subject to the independent consultant review and reporting process required by subdivision (d)(2) of section 2704.08. In other words, prior to expenditure of bond proceeds on an existing system, the expenditure would be subject to evaluation whether it improved a shared system while additional work is completed for high-speed train service and passenger providers benefited in the near-term.

We conclude that section 2704.78 did not effect an implied partial repeal of the Bond Act.

*O'Farrell* is factually inapposite to this case. In *O'Farrell*, the ballot proposition described the exact scope of the road that was to be constructed with bond funds. (*O'Farrell, supra*, 189 Cal. at pp. 347-348.) The court concluded that the county did not have discretion to build only a part of the road. (*Ibid.*) As noted, the Bond Act did not specify project details but rather acknowledged in section 2704.04, subdivision (c), that additional related capital equipment and facilities and purposes would be funded with bond proceeds as the project progressed. The project in *O'Farrell*, construction of a single four-mile road, bears no resemblance to a complex public works project like the high-speed train system. In addition, subsequent cases have not found *O'Farrell* to bar reasonable changes in executing projects financed by bonds. (See, e.g., *Sacramento-Yolo Port Dist. v. Rodda* (1949) 90 Cal.App.2d 837, 840 [when the authority proposing the

24

bond issue "has not confined itself to an absolutely definite and inflexible plan of construction and expenditure by the proposal submitting the bond issue, and has proceeded free from fraud and in good faith in accordance with such broad program, there is no reason why it cannot be permitted to carry on the improvement to the extent of the funds available"]; *City of San Diego v. Millan* (1932) 127 Cal.App. 521, 530 [substituting types of dams funded by bond issue].)

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs. (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


/s/<br>RAYE, P. J.


We concur:


/s/
BLEASE, J.


/s/
ROBIE, J.